ERIK A. OLSON [8479]
EOLSON@MOHTRIAL.COM
TREVOR C. LANG [14232]
TLANG@MOHTRIAL.COM
**MARSHALL OLSON & HULL, PC**
NEWHOUSE BUILDING
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

ATTORNEYS FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LIFEVANTAGE CORPORATION, a Colorado corporation | **COMPLAINT** |
| Plaintiff, | |
| v. | |
| SHERI HOLLENBACK, an individual, JOSEPH BOWEN, an individual, CINDA BAKER, an individual, and LORI SHERIDAN, an individual, | Civil No. 2:21-cv-00149 |
| Defendants. | |

Plaintiff LifeVantage Corporation ("LifeVantage") hereby complains of defendants as follows.

## GENERAL ALLEGATIONS

### The Parties

1.      LifeVantage is a Colorado corporation with its principal place of business located at 9785 South Monroe Street, Suite 300, Sandy, Utah 84070.

2.      Sheri Hollenback ("Hollenback") is an individual who resides in Nevada.

3.      Joseph Bowen ("Bowen") is an individual who resides in Nebraska.

4.      Cinda Baker ("Baker") is an individual who resides in Nebraska.

5.      Lori Sheridan ("Sheridan") is an individual who resides in Vermont.

### Jurisdiction and Venue

6.      This Court has subject matter jurisdiction in this civil action pursuant to 28 U.S.C. § 1332, as the parties reside in different states and the amount in controversy exceeds $75,000, which represents the minimum value to LifeVantage or the expected costs to defendants of the sought injunction, and alternatively the monetary damages resulting from defendants' wrongful conduct.

7.      This Court has personal jurisdiction over defendants where each defendant has consented to personal jurisdiction in this district, transacted business within this district, and caused injuries as stated below within this district.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### The Business of LifeVantage

9.      LifeVantage is a network marketing company based in Sandy, Utah that sells nutraceutical and other health and well-being products.

10.     Network marketing involves a salesforce of independent salespersons. LifeVantage refers to these individuals as LifeVantage Distributors.  LifeVantage has approximately 67,000 active LifeVantage Distributors worldwide.

11.     LifeVantage Distributors are remunerated pursuant to a compensation plan, which provides for a structured series of commissions and bonuses based on sales volume. LifeVantage Distributors' compensation includes commissions earned from their sales to

Customers and other Distributors, as well as a percentage of the sales volume earned by their "downline" sales network.

12.     A LifeVantage Distributor's downline consists of all other LifeVantage Distributors sponsored by that individual, as well as all LifeVantage Distributors enrolled by those LifeVantage Distributors.  A successful LifeVantage Distributor may have dozens of individuals in their downline.  So that Distributors can monitor the success of their downline, LifeVantage generates downline activity reports that contain information such as the identity of the LifeVantage Distributors in each downline, their positions, commissions, and their contact information.

13.     The information contained in these reports is highly confidential and is a proprietary trade secret owned exclusively by LifeVantage.  This information is made available to LifeVantage Distributors solely for use in their LifeVantage businesses, and is accessible only through a password protected site (the "LifeVantage Distributor Portal").  Access to the site is terminated once a distributor leaves LifeVantage.

14.     LifeVantage Distributors are an essential component of LifeVantage's business success because they help sell products and generate revenue.  Indeed, the success of LifeVantage is dependent on an engaged and motivated field of Distributors who are committed to the company and its products.  LifeVantage invests millions of dollars in commissions, in training, and in motivating its Distributors so that they will invest their time and effort to promote the company and its products.  Actions that undermine the confidence that the Distributors have in the company and its products have potentially devastating effects, both on the company and on other loyal Distributors.

15.     Successful LifeVantage Distributors spend a great deal of time and effort developing their sales and marketing organizations and establishing relationships and goodwill with Customers.  In turn, LifeVantage's success and reputation are largely based on the goodwill created by its LifeVantage Distributor organizations.  Thus, the largest risk to LifeVantage's business model is poaching by other network marketing organizations and cross-recruiting by LifeVantage Distributors who decide to join competitors.

16.     LifeVantage is indispensable to LifeVantage Distributors' efforts in building a downline.  LifeVantage provides the highly sought-after health and well-being product offerings and the forum and community that LifeVantage Distributors need to build a successful network marketing business.  LifeVantage invests heavily in its resources used by LifeVantage Distributors.

17.     LifeVantage has been highly successful in marketing its products domestically and abroad and is ranked as one of Direct Selling News' "Global 100" network marketing companies.

### Defendants' LifeVantage Businesses

18.     In or about 2013, Hollenback enrolled as a LifeVantage Distributor.

19.     After joining LifeVantage, Hollenback built a successful business.  She attained Premier Pro 8 status, the fifth-highest level a LifeVantage Distributor can attain at LifeVantage. The highest rank at LifeVantage is Presidential Master Pro 10 status.

20.     Bowen, Baker, Sheridan, and other yet unknown defendants also enrolled as LifeVantage Distributors and built successful LifeVantage businesses.

**The LifeVantage Website, Agreement, and Policies and Procedures**

21.     When individuals such as defendants apply to become LifeVantage Distributors, they do so online at LifeVantage's website, http://www.lifevantage.com.

22.      Once on LifeVantage's website, the prospective Distributor is presented with the option to "Join Us."

23.     Once a prospective user clicks on the "Join Us" link, the prospective Distributor is taken to a webpage containing the registration form that the prospective user must complete and submit in order to become a LifeVantage Distributor.

24.     As part of the registration process, a prospective user is required to acknowledge that he or she agrees to and accepts the terms of the LifeVantage Distributor Application and Agreement (the "Agreement"), which provides the terms and conditions that govern the relationship between LifeVantage and the prospective distributor.  This Agreement expressly incorporates the Policies and Procedures.  Agreement at § 10.3.  A prospective Distributor must acknowledge that he or she has read and agreed to both.  (Copies of the relevant Agreement and the most recent version of the Policies and Procedures (dated Feb. 2020) are attached as Exhibits 1 and 2, respectively, to the Declaration of Michael Weston on file in this matter.)

25.     At the time that defendants became fully enrolled LifeVantage Distributors, they agreed to the terms and conditions contained in the Agreement and the Policies and Procedures.

26.     Each year, the Agreement is automatically renewed if the LifeVantage Distributor is in good standing.  Policies and Procedures at § 3.3.

27.     Whenever an amendment to the Agreement is made, the LifeVantage Distributor may accept the amendment by continuing to purchase or sell Company products, enroll, or accept commissions or bonuses from LifeVantage.  Policies and Procedures at § 2.3.

28.     A LifeVantage Distributor is entitled to retail profits, commissions, and bonuses—so long as the LifeVantage Distributor is "active and in compliance with the Agreement."  Policies and Procedures at § 12.1.  A remedy for "[a]ny breach of the Agreement, including these Policies and Procedures" includes "[l]oss of rights to one or more bonus and commission payments; in whole or in part."  *Id.* at § 14.13.  LifeVantage "insist[s] on compliance with the Agreement . . . governing the conduct of a LifeVantage Distributor."  *Id.* at § 2.6.  LifeVantage conditions all statements regarding income on a distributor's continued compliance and good standing with respect to their obligations to LifeVantage.

29.     Defendants were in fact paid commissions and bonuses while they were LifeVantage Distributors in accordance with the Agreement they each signed.

30.     As part of their Agreement, defendants agreed to avoid Conflicts of Interest, as defined in Section 6 of the Policies and Procedures.  For example, although the Policies and Procedures allow LifeVantage Distributors to "participate in other direct selling or network marketing or multilevel marketing ventures," they must adhere to restrictions prohibiting contact with other LifeVantage Distributors.  The Conflict of Interest polices are intended to "[p]rotect the rights of all LifeVantage Distributors by providing a framework within which each LifeVantage Distributor may work in an ethical, effective and secure manner."  Policies and Procedures at § 1.

31.     LifeVantage Distributors agree that they "shall not engage in any actual or attempted recruitment or enrollment of a LifeVantage Distributor for other Network Marketing Ventures, either directly or through a third party." Policies and Procedures at § 6.1.

32.     The Policies and Procedures define a "Network Marketing Venture" as "other direct selling or network marketing or multilevel marketing ventures." Policies and Procedures at § 6.

33.     During the term of the Agreement, LifeVantage Distributors agree they "may not sell, offer to sell, or promote any competing non-LifeVantage products or services to LifeVantage Distributors." Policies and Procedures at § 6.1(2).

34.     LifeVantage Distributors agree to restrictions on communication and confidentiality of downline information, which is "provided to LifeVantage Distributors in strictest confidence" and "for the sole purpose of assisting LifeVantage Distributors in working with their respective Marketing Organization in the development of their LifeVantage Distributorship and sales Marketing Organizations." *Id.* at § 7.1. They acknowledge that downline reports and the information they contain are "confidential and constitute proprietary information and business trade secrets and are owned exclusively by LifeVantage." *Id.* Distributors cannot use downline reports "to compete with LifeVantage or for any purpose other than promoting their LifeVantage Distributorship." *Id.* at § 7.1(3). Information pertaining to downlines cannot be used to "[r]ecruit or solicit any LifeVantage Distributor or Customer of LifeVantage listed on any report or in any manner attempt to influence or induce any LifeVantage Distributor or Customer to alter their business relationship with LifeVantage." *Id.* at § 7.1(4).

35.     Based on their position as LifeVantage Distributors, defendants were able to access the LifeVantage Distributor Portal, through which they received confidential, proprietary, trade secret information about their downline.

36.     The Policies and Procedures provide that "[f]or a period of two (2) years following the Cancellation of a LifeVantage Distributor's Agreement, the former LifeVantage Distributor is strictly prohibited from recruiting any LifeVantage Distributor or Customer for another Network Marketing Venture."  Policies and Procedures at § 6.1(1).

37.     Two years is an appropriate timeframe for a non-solicitation covenant because it takes substantial time, even years, to reposit in LifeVantage the goodwill built by networks of LifeVantage Distributors.  After two years, it is substantially less likely that a cross-recruitment effort will be successful.  But where a non-solicitation covenant has been breached, as here, it is extremely difficult, if not impossible, to restore LifeVantage goodwill and it is extremely challenging to retain contacts who are being actively solicited.

38.     Under the Agreement, LifeVantage Distributors acknowledge that the covenants set forth in the Agreement and in the Policies and Procedures "are reasonable and necessary to protect the legitimate interests of LifeVantage and that LifeVantage would not enter into the Agreement in the absence of such covenants."  Agreement at § 8.3.  Additionally, LifeVantage Distributors acknowledge that a "breach of the covenants set forth in this Agreement would likely cause LifeVantage irreparable harm, the amount and extent of which would be very difficult to estimate or ascertain."  *Id.*  LifeVantage Distributors agree that LifeVantage is "entitled, without the necessity of posting a bond or other security, to the issuance of injunctive relief to enjoin [LifeVantage Distributors] from breaching or threatening to breach such

covenants," and that "[i]njunctive relief shall not be the exclusive remedy available to LifeVantage." *Id.*

## Continuing Harm Caused by Defendants' Wrongful Acts

39.     LifeVantage's business goodwill is inextricably linked to the viability of its LifeVantage Distributor network because those distributors are a significant source of the company's sales force.

40.     There is a significant risk of a loss of momentum and a cascading effect of defections to a competing company if high-level LifeVantage Distributors like Hollenback and others begin diverting their downline, which is well underway as detailed below.

41.     The damage caused by improper recruiting is often not fully captured by the number of people who may actually cancel their LifeVantage distributorships.  Many distributors who are recruited to a competing company simply become inactive or reduce their LifeVantage purchases and activity, or they stop sponsoring other distributors and building their LifeVantage business.  That damage is as severe as that caused by the actual cancellation of a LifeVantage distributorship, can be devastating for the company, and causes irreversible and irreparable damage to LifeVantage's business goodwill.

42.     Actions by Hollenback and others seeking to recruit LifeVantage Distributors to join another network marketing company are enormously disruptive and cause LifeVantage irreparable harm—much more so than solicitations by strangers.  This is particularly true for Hollenback and others who, as high ranking LifeVantage Distributors, had a highly visible status in LifeVantage's network.

**Hollenback Launches a Campaign to Solicit LifeVantage Distributors**

43.     Starting at least in October 2020, Hollenback began a campaign to recruit current LifeVantage Distributors to leave LifeVantage and join her at Modere, a competing network marketing business.  *See* S. Hollenback Cross-Recruiting Summary (attached as Exhibit 3 to the Declaration of Michael Weston on file in this matter).]

44.     On October 16, 2020, Hollenback posted a live, fourteen-and-a-half-minute-long video to her public Facebook page in which she announced that she was resigning as a LifeVantage Distributor and joining a new network marketing business (the "Video").  The video can be accessed at the following link (accessed October 22, 2020):

https://www.facebook.com/sheri.hollenback/videos/10218112773752200

45.     In posting the Video, Hollenback encouraged anyone watching the Video to disseminate the Video to their friends, make live comments regarding their interest in joining Hollenback, join her at her new network marketing company, and reach out to Hollenback for more details about the opportunity.  This included numerous friends on Hollenback's Facebook page who are LifeVantage Distributors.

46.     Within just one week of Hollenback posting the Video, the Video had been viewed at least 8,700 times, it was shared at least 84 times, and it received 544 comments.

47.     Following Hollenback's invitation, dozens of LifeVantage Distributors who watched, commented on, or shared the Video promptly became Modere distributors.

**Defendants Have Engaged in Cross-Recruiting**

48.     Following Hollenback's lead, a substantial number of LifeVantage Distributors, including defendants, posted similar Facebook videos announcing that they were leaving

LifeVantage and joining Modere, and encouraging others viewing their videos—which in turn included numerous LifeVantage Distributors—to join them with their new competing company.

49.     Defendants have posted Facebook videos, comments, and messages—among other solicitations directed at LifeVantage Distributors—in which they advertise the Modere opportunity (both in terms of products and compensation) and encourage anyone watching or listening to respond to learn more.

50.     Hollenback and other defendants have actively commented on Facebook pages of defendants and other LifeVantage Distributors, whose Facebook friends in turn include nearly 100 LifeVantage Distributors.

51.     On October 17, 2020—one day after posting and disseminating the Video on Facebook and in violation of Section 7 of the Policies and Procedures—Hollenback accessed the LifeVantage Distributor Portal and utilized confidential, trade secret information about her downline in the course of her effort to recruit LifeVantage Distributors and Customers to her competing network marketing venture.

**LifeVantage's Efforts to Remedy Defendants' Breaches Without Court Involvement**

52.     On October 23, 2020, LifeVantage sent a letter to Hollenback demanding that she cease and desist from further breaches of her covenants, and notifying her that if she failed to demonstrate compliance with her covenants, that a lawsuit would be filed against her and any other LifeVantage Distributors working in concert with her to breach their respective covenants.

53.     Following LifeVantage's letter to Hollenback, there was a dialogue both with Hollenback's counsel and with Modere's counsel in an effort to ensure that Hollenback's wrongful conduct would stop.  In the course of that dialogue, LifeVantage was assured that

Hollenback had deleted from her public Facebook page anyone affiliated with LifeVantage, that she and those former LifeVantage Distributors in her new Modere organization would abide by their covenants, and that Modere was actively taking steps to prevent cross-recruiting by former LifeVantage Distributors.

54.    However, since that time, LifeVantage has recently confirmed that defendants have continued to breach their covenants.  Defendants continue to maintain, even on their public Facebook pages, a connection with nearly 100 active LifeVantage Distributors whom they continue to cross-recruit in violation of their covenants through public and private videos and messages.

**Sheridan's Solicitation Activities**

55.    Beginning in January 2021, Sheridan has posted actively on a public Facebook page.  Hollenback has actively commented on Sheridan's public Facebook page.  *See* L. Sheridan Cross-Recruiting Summary (attached as Exhibit 4 to the Declaration of Michael Weston on file in this matter).]

56.    In numerous Facebook posts on Sheridan's Facebook page, both Hollenback and Sheridan have advertised Sheridan's success as a Modere distributor, and the effectiveness of various Modere products, including the Liquid Biocell collagen product.  Sheridan has advertised product discounts, giveaways, and prizes, and has made numerous enticements to solicit LifeVantage Distributors and Customers.

57.    On January 3, 2021, and in violation of Section 7 of the Policies and Procedures—Sheridan accessed the LifeVantage Distributor Portal and utilized confidential,

trade secret information about her downline in the course of her effort to recruit LifeVantage

Distributors and Customers to her competing network marketing venture.

58.     On January 23, 2021, Sheridan contacted a LifeVantage Distributor in Vermont

by text message and stated:

> I've ventured into a partnership with a new company that has all the clean living
> household and personal products that I'd been looking for!  They also have some
> very similar products to LV.  I'm not sharing with you to try to recruit or sell to
> you.  I want to touch base with folks that have made an impact in my life.  I hope
> we can stay in touch.  I just won't be kicked around the LV community much.

*See* L. Sheridan text messages (attached as Exhibit 5 to the Declaration of Michael Weston on

file in this matter).

### Bowen's Solicitation Activities

59.     Bowen, formerly a high-ranking Pro 7 status LifeVantage Distributor, forwarded

the Video and followed Hollenback's direction in the Video by joining Modere.  *See* J. Bowen

Cross-Recruiting Summary (attached as Exhibit 6 to the Declaration of Michael Weston on file

in this matter).]

60.     On October 19, 2020, and in violation of Section 7 of the Policies and

Procedures—Bowen accessed the LifeVantage Distributor Portal and utilized confidential, trade

secret information about his downline in the course of his effort to recruit LifeVantage

Distributors and Customers to his competing network marketing venture.

61.     In late October 2020, Bowen hosted a Facebook live "watch party" for his

contacts and friends—a great many of whom are LifeVantage Distributors—to watch a

Hollenback recruitment video.

62.     On November 7, 2020, Hollenback posted on Bowen's public Facebook page:

Joe Bowen OMG

CONGRATULATIONS You are #3 out of 15,000+ people!! Crazy impressive what you're team has done in just a few weeks!

P.S-We Love You

63.     Two weeks later, on November 20, 2020, as Bowen continued his recruitment of LifeVantage Distributors, Hollenback posted on Bowen's public Facebook page:

I'm straight FREAKING Out

Joe Bowen OMG

CONGRATULATIONS

YOU & your team JUST Hit the Top Ranks in 3 Weeks!#SpeechlessRightNow

64.     Over the ensuing several weeks, Bowen's solicitations via his public Facebook page have continued.  In numerous Facebook posts on Bowen's Facebook page, both Hollenback and Bowen have advertised Bowen's success as a Modere distributor, and the effectiveness of various Modere products, including the Liquid Biocell collagen product and the Trim weight loss product.  Bowen has advertised product discounts, giveaways, and prizes, and has made numerous enticements to solicit LifeVantage Distributors and Customers.

65.     Bowen has posted several testimonials about Modere products.  He has posted videos of himself ingesting Modere products.

66.     During this timeframe, Bowen has advertised on his public Facebook page various parties and events at which to market the Modere opportunity.  One of these events hosted by Bowen, attended by several people, and advertised on Facebook with photographs included a live appearance by Hollenback wearing clothing bearing a Modere logo.

67.     Throughout the course of Bowen's ongoing public Facebook solicitations, Hollenback has continued to post about Bowen's success as a Modere distributor and she has posted frequent comments in support of Bowen's solicitation efforts.

68.     As of the time of the filing of this motion, Bowen maintains numerous LifeVantage Distributors as Facebook friends.

<strong>Baker's Solicitation Activities</strong>

69.     Baker, formerly a high-ranking Pro 6 status LifeVantage Distributor, forwarded the Video and followed Hollenback's direction in the Video by joining Modere.

70.     Beginning on October 16, 2020, and immediately following Hollenback's initial posting of the Video, and continuing to the present time, Baker has engaged in frequent posts to her public Facebook page.  In numerous Facebook posts, both Hollenback and Baker have advertised Baker's success as a Modere distributor, the promotions and success of those who join Baker's sales organization at Modere, and the effectiveness of various Modere products, including the Liquid Biocell collagen product and the Trim weight loss product.  Baker has advertised product discounts, giveaways, and prizes, and has made numerous enticements to solicit LifeVantage Distributors and Customers.  *See* C. Baker Cross-Recruiting Summary (attached as Exhibit 7 to the Declaration of Michael Weston on file in this matter).

71.     On October 15, 2020—one day before posting her own Modere recruitment information, and in violation of Section 7 of the Policies and Procedures—Baker accessed the LifeVantage Distributor Portal and utilized confidential, trade secret information about her downline in the course of her effort to recruit LifeVantage Distributors and Customers to her competing network marketing venture.

72.     Baker has advertised on her public Facebook page various events for her Modere sales organization to meet together.

73.     Throughout the course of Baker's ongoing public Facebook solicitations, Hollenback has continued to post on Baker's public Facebook page regarding Baker's success as a Modere distributor and she has posted comments in support of Baker's solicitation efforts, similar to what Hollenback posted on Bowen's public Facebook pages.

74.     As of the time of the filing of this motion, Baker maintains numerous LifeVantage Distributors as Facebook friends.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**

75.     LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

76.     The Agreement, together with the Policies and Procedures, form a valid and enforceable contract between LifeVantage and each LifeVantage Distributor, including defendants.

77.     Up until defendants' breaches of the Agreement, as detailed above, LifeVantage performed and satisfied all obligations owing to defendants under their respective Agreements.

78.     By virtue of the activities and conduct described above, defendants have materially breached their covenants with LifeVantage.

79.     As a result of defendants' material breaches of contract, LifeVantage has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing

80.     LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

81.     The Agreement with LifeVantage includes a covenant of good faith and fair dealing between the parties to that contract.

82.     Defendants have breached the implied covenant of good faith and fair dealing by breaching confidentiality and nonsolicitation provisions, as detailed above, in contravention of the clear intent and design of the Agreement.

83.     Defendants have attempted to avoid their conflict of interest obligations under the Agreement by subterfuge.  This subterfuge is an attempt to evade their contractual duties and rob LifeVantage of the protections of the Agreement in bad faith.

84.     Based on defendants' breaches, LifeVantage is entitled to recover damages from defendants in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### Tortious Interference with Current and Prospective Economic Relations

85.     LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

86.     Acting in concert with each other, defendants have intentionally interfered with LifeVantage's prospective economic relations by actively recruiting LifeVantage Distributors and causing them to do likewise.

87.     Defendants know that LifeVantage Distributors are bound by agreements not to solicit or recruit other LifeVantage Distributors to participate in or sell for other network

marketing companies.  In spite of this knowledge, defendants have willfully and deliberately induced LifeVantage Distributors to violate the obligations arising under their respective Agreements with LifeVantage.

88.     The means by which defendants intentionally interfered with LifeVantage's economic relations were improper.  In particular, defendants have used misrepresentation and misappropriated proprietary information in recruiting LifeVantage Distributors.

89.     As a direct and proximate result of defendants' actions, LifeVantage has suffered damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Misappropriation of Trade Secrets**

90.     LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

91.     The downline information obtained by defendants constitutes trade secrets as defined by Utah Code § 13-24-2(4).

92.     LifeVantage derives independent economic value, actual and potential, from the fact that this information is not generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

93.     LifeVantage has made all reasonable efforts to maintain the secrecy of that information, which include without limitation storing downline reports on a password protected site, terminating access to the site once a distributor leaves LifeVantage, and requiring LifeVantage Distributors to agree to be bound by the Agreement and the Policies and Procedures, which detail the strictly confidential nature of this information.

94.     By utilizing LifeVantage's trade secrets other than for LifeVantage's business, defendants have misappropriated LifeVantage's trade secrets in violation of Utah Code §§ 13-24-1 *et seq*., or at minimum, LifeVantage is threatened with the misappropriation of its trade secrets.

95.     Pursuant to Utah Code § 13-24-3, LifeVantage is entitled to preliminary and permanent injunctive relief and any other orders necessary to effectuate the return and or protection of LifeVantage's trade secrets.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy

96.     LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

97.     Defendants willfully, intentionally and knowingly agreed and conspired with each other to engage in the alleged wrongful and illegal conduct alleged herein, including but not limited to their breach of contract, solicitation and recruitment of LifeVantage Distributors, misappropriation of LifeVantage's trade secrets, interference with LifeVantage's relationship with its distributors, and breach of other duties to LifeVantage.

98.     Defendants' wrongful and illegal conduct was pursuant to, and in furtherance of, the agreement and/or furthered the conspiracy by encouraging, ratifying, or adopting the conduct of each other.

99.     As a direct and proximate result of the conduct in furtherance of the conspiracy, LifeVantage has suffered injury, damage, loss and harm, including but not limited to the loss of distributors.  The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

100.    Defendants' intentional agreement to commit, and commission of, these wrongful acts was willful, malicious, oppressive and in conscious disregard of LifeVantage's rights. LifeVantage is therefore entitled to an award of punitive damages to deter Defendants' future wrongful conduct.

101.    LifeVantage is entitled to recover all actual damages that naturally and proximately resulted from the conspiratorial acts of the Defendants.  LifeVantage also seeks punitive damages insofar as Defendants' conspiratorial acts were malicious and/or reflected a willful and reckless indifference to LifeVantage.

### SIXTH CLAIM FOR RELIEF
**Injunctive Relief, Temporary Restraining Order**

102.    LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

103.    Defendants' activities and conduct, as described above, has caused, and will continue to cause, irreparable harm to LifeVantage.

104.    Any legal remedies available to LifeVantage will be inadequate to compensate for the harm it has suffered and will continue to suffer as a result of defendants' actions.

105.    The Agreement expressly provides for injunctive relief to enforce its terms.

106.    LifeVantage is entitled to a temporary, preliminary, and thereafter permanent, injunction restraining defendants, and anyone acting in concert with them, from the following wrongful activities:

a.    Recruiting or soliciting other LifeVantage Distributors and customers to another network marketing venture, including, without limitation, through in-person meetings, phone calls, text messages, social media, email solicitations, and other means,

during the term of the Agreement and for a period of two years from the termination date thereof or until such later date as deemed just and equitable, based on their breaches following the termination of their respective Agreements; and

     b.     Utilizing in any way and for any reason LifeVantage's confidential information and trade secrets.

107.     LifeVantage is also entitled to an order and decree that defendants return to LifeVantage any confidential information and trade secrets in their possession.

108.     LifeVantage is entitled to a preliminary, and thereafter permanent, injunction against defendants providing the above injunctive relief on the basis that:

     a.     LifeVantage has suffered, and will continue to suffer, immediate and irreparable harm unless an injunction is issued;

     b.     The threatened and ongoing injury to LifeVantage from defendants' conduct outweighs whatever purported harm the proposed injury may cause to them;

     c.     Injunctive relief, if issued, would not be adverse to the public interest; and

     d.     There is a substantial likelihood that LifeVantage will prevail on the merits, or this case presents serious issues on the merits which should be the subject of further litigation.

109.     No security should be required to be posted, since the injunctive relief sought simply would maintain the status quo.  Additionally, the Agreement expressly provides that LifeVantage shall be entitled to injunctive relief without the necessity of posting a bond.

## SEVENTH CLAIM FOR RELIEF
**Declaratory Judgment**

110.    LifeVantage incorporates by reference all preceding allegations of this Complaint as though fully set forth herein.

111.    Under Utah law, LifeVantage is entitled to a declaratory judgment from this Court that defendants are not entitled to rebates, commissions, or bonuses under the Agreement or the Policies and Procedures as of the date of their breaches of the Agreement as described herein; and a declaration that LifeVantage is complying with the Agreement and the Policies and Procedures in refusing or otherwise withholding payment.

## PRAYER FOR RELIEF

WHEREFORE, LifeVantage prays for the following relief:

1.    For a judgment against defendants for damages in an amount to be determined at trial;

2.    For temporary, preliminary and permanent injunctive relief as detailed above;

3.    For a declaratory judgment as detailed above;

4.    For punitive and exemplary damages to be determined at trial;

5.    For costs and reasonable attorney fees as allowed by law; and

6.    For such further relief as the Court deems just and equitable.

DATED this 10th day of March, 2021.

MARSHALL OLSON & HULL, PC

BY:    /s/ Erik A. Olson
       ERIK A. OLSON
       TREVOR C. LANG

ATTORNEYS FOR PLAINTIFF

–22 of 22–
COMPLAINT